UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                            :
JAMES G. PAULSEN, Regional Director of                      :
Region 29 of the National Labor Relations                   :
Board, for and on behalf of the NATIONAL                    :  **MEMORANDUM**
LABOR RELATIONS BOARD,                                      :  **DECISION AND ORDER**
                                                            :
                          Petitioner,                   :  12 Civ. 4845 (BMC)
                                                            :
        -against-                                          :
                                                            :
GVS PROPERTIES, LLC,                                        :
                                                            :
                          Respondent.                   :
                                                            :
----------------------------------------------------------- X

**COGAN**, District Judge.

      Before me is a petition for a preliminary injunction under § 10(j) of the National Labor Relations Act ("NLRA") filed by James G. Paulsen, the Regional Director of Region 29 of the National Labor Relations Board ("NLRB" or the "Board"). The petition seeks relief pending determination of proceedings that are presently *sub judice* before Administrative Law Judge Kenneth Chu, in which petitioner claims that respondent GVS Properties, LLC ("GVS") has engaged and is engaging in unfair labor practices within the meaning of Sections 8(a)(1) and (5) of the NLRA. Petitioner seeks an injunction restraining respondent from further violations of Section 8(a)(1) and directing it to bargain with International Association of Machinists and Aerospace Workers, AFL-CIO, District 15, Local Lodge 447 (the "Union") as allegedly required under Section 8(a)(5).

      The Court ordered respondent to show cause why it should not grant the relief requested. Having heard oral argument on the petition and reviewed the parties' submissions and the underlying administrative record, the Court concludes that petitioner has not established

reasonable cause for the Court to believe that GVS has committed an unfair labor practice. The petition is therefore denied.

## BACKGROUND

The parties have agreed that this petition be decided on the administrative record developed before Administrative Law Judge Chu, which includes the hearing transcript and exhibits admitted at the hearing, since there are no material facts in dispute. Petitioner has also submitted the affidavit of Norman Brown, a former Union representative and current Legislative Director and Business Representative of the Union, which the Court has considered. The following is a summary of the undisputed facts drawn from those submissions.

GVS owns and manages residential and commercial buildings. On or about February 17, 2012, GVS purchased certain properties in New York City from property owner Broadway Portfolio I LLC ("Broadway"). Until the time of the sale, Broadway received services from Vantage Building Services, LLC ("Vantage"), a company that provides management services to residential and commercial real estate building owners throughout New York City and is responsible for the maintenance, repair and upkeep of the buildings it services.

In early 2010, maintenance employees employed by Vantage at numerous locations across the city, including those employees who serviced the properties owned by Broadway, elected the Union as their collective bargaining representative. In May 2010, the Union and Vantage entered into a collective bargaining agreement ("CBA") that covered the employees who serviced the properties owned by Broadway, referred to by the Union as "the Unit." The Unit consists of all full-time superintendents and porters (also known as maintenance technicians and maintenance assistants, respectively), excluding all other employees, clerical employees, managerial employees, guards and supervisors as defined in the NLRA, employed at the

following addresses in New York, New York: 601 West 139th Street (a/k/a 3421 Broadway); 614 West 157th Street; 600 West 161st Street (a/k/a 3851 Broadway); 559 West 164th Street; 701 West 175th Street; 700 West 176th Street; and 667 West 177th Street (a/k/a 4180 Broadway) ("New York City properties").

When GVS bought the New York City properties from Broadway, on or about February 17, 2012, GVS assumed Vantage's management operations of those properties. On or about February 18, 2012, GVS hired seven out of eight of the Unit employees pursuant to its obligations under the Displaced Building Service Workers Protection Act ("Displaced Workers Act").

In relevant part, the Displaced Workers Act states:

(5) A successor employer shall retain for a ninety (90) day transition employment period at the affected building(s) those building service employee(s) of the terminated building service contractor (and its subcontractors), or other covered employer, employed at the building(s) covered by the terminated building service contract or owned or operated by the former covered employer.

(6) If at any time the successor employer determines that fewer building service employees are required to perform building services at the affected building(s) than had been performing such services under the former employer, the successor employer shall retain the predecessor building service employees by seniority within job classification; provided, that during such 90-day transition period, the successor employer shall maintain a preferential hiring list of those building service employees not retained at the building(s) who shall be given a right of first refusal to any jobs within their classifications that become available during that period.

(7) Except as provided in part (6) of this subsection, during such 90-day period, the successor contractor shall not discharge without cause an employee retained pursuant to this section.

(8) At the end of the 90-day transition period, the successor employer shall perform a written performance evaluation for each employee retained pursuant to this section. If the employee's performance during such 90-day period is satisfactory, the successor contractor shall offer the employee continued employment under the terms and conditions established by the successor employer or as required by law.

N.Y.C. Admin. Code § 22-505.

Although the Displaced Workers Act allows termination for cause, GVS did not terminate any of its predecessor's employees on that basis at any point during the 90-day transition employment period. GVS did, however, terminate one of the Unit employees on or about February 18, 2012, having decided that it did not need all eight employees to perform the services required. By letter dated February 17, 2012, GVS's Operations Manager, Nicholas Conway, advised each of the seven employees who were not terminated that: (a) on or about February 18, 2012, GVS would be assuming management of the New York City properties and that effective February 18, 2012, the employees would no longer be employed by Vantage; (b) if the employee wished to continue working at the properties, he would have to apply to Mr. Conway; (c) all prior employment terms and conditions were revoked in their entirety; (d) GVS was unilaterally setting the initial terms and conditions of any employee's employment; (e) GVS was not hiring all employees who formerly worked at the properties; (f) employees who applied to Mr. Conway "will be hired on a temporary and trial basis to permit GVS Properties to fully assess its staffing needs" for a "ninety (90) day period;" (g) upon conclusion of the 90-day period, GVS could terminate the employee's employment "at any time, with or without cause and without prior notice, except as may be required by law;" (h) it was anticipated that GVS would determine its hiring and staffing needs no earlier than several weeks after the conclusion of the 90-day period; and (i) the letter did not constitute an agreement or contract for employment for any specified period or definite duration.

On or about March 7, 2012, the Union made a written demand that GVS recognize and bargain with it as the exclusive collective bargaining representative of the Unit. On or about March 13, 2012, GVS rejected the Union's request to commence bargaining because GVS was

4

still in the midst of the 90-day transition period and had not yet established its full complement of employees. GVS explained, in its correspondence to the Union, that "at this juncture it is unclear whether District 15, Local 447 International Association of Machinists and Aerospace Workers, AFL-CIO ("Local 15") is a *Burns Successor* as that term is generally used and accepted in the field of labor relations. Upon the conclusion of the ninety (90) day evaluation period, and the offer of a more permanent position, GVS will determine if it has a bargaining obligation with Local 15."

During the 90-day transition period, GVS reviewed the work performance of all the employees retained by GVS. At the conclusion of the transition period, on May 16, 2012, GVS terminated two Unit employees and hired four new non-Unit employees.[1] The next day, GVS terminated one additional Unit employee. As a result, on or about May 16, 2012, GVS's employee complement consisted of four employees who previously worked for Vantage and four new employees who had not.

When GVS assumed management responsibilities at the New York City Properties, it offered Unit employees employment at terms and conditions that deviated significantly from the terms and conditions under the Union's CBA. The Union's Business Representative, Norman Brown, states in his affidavit that Jose Cepeda, a Unit employee who worked at one of the buildings purchased by GVS, complained that he was given a letter that said his wages were being cut from $15.00 an hour to $10.00 an hour and that his health benefits were coming to an end. Mr. Cepeda asked Mr. Brown what the Union was going to do about the changes. Mr. Brown also avers that in addition to cutting the employees' hours and discontinuing their health

---

[1] Petitioner disputes the fact that May 16, 2012 is the last day of the 90-day period and alleges that it is actually the 89th day. GVS concedes that two employees were terminated on the 89th day, but argues that this was necessary because those two employees were not scheduled to work the following day. This factual issue is immaterial to the determination of the petition, especially since petitioner has not alleged that GVS violated the requirements of the Displaced Workers Act.

benefits, GVS has ended other benefits under the CBA, such as "comp time." Moreover, because GVS refuses to recognize the Union, the Union cannot process grievances that employees have about losing their jobs or the imposition of less favorable terms. Finally, Mr. Brown claims that the employees had free rent with their previous employer, but they are now forced to pay rent while working under GVS.

Mr. Brown twice states that since GVS has refused to recognize the Union, approximately seven employees have been terminated by GVS, and the Union has been unable to assist them with getting their jobs back. The Court notes that there is an inconsistency in petitioner's position regarding the number of Unit employees who have been terminated by GVS. Petitioner's submissions, citing the record, claim that one Unit employee was terminated at the beginning of the 90-day transition period because GVS decided it did not need so many employees, two Unit employees were terminated on May 16, 2012, and one Unit employee was terminated on May 17, 2012, resulting in a total of four Unit employees who were terminated by GVS, not seven, as alleged by Mr. Brown. As it appears that Mr. Brown's figure is inaccurate, the Court shall disregard it and only consider the figure presented in petitioner's submissions and the record.

Petitioner further claims that since GVS failed to recognize and bargain with the Union, support for the Union has eroded. Mr. Brown states that he believes that Mr. Cepeda is the only employee who still pays Union dues "since the others have no income to pay them." The terminated employees are allegedly not attending Union meetings because they don't have the time. Mr. Brown further states that he has spoken to Mr. Cepeda about organizing the new non-Unit employees who were hired by GVS to try to get them to support the Union, but was told that these employees "understand what's going on and don't want to talk to him." Mr. Brown

claims that Mr. Cepeda's role in the Union has been "substantially diminished since there is not much he can do within the shop as shop steward when there is no recognition."

Additionally, GVS's witness, Nicholas Conway, testified at the hearing before the ALJ that an employee who was not terminated by GVS, Harold Jiminez Maderas, expressed his desire to have GVS "represent" him instead of the Union. According to Mr. Conway, Mr. Maderas said "he was happy working for [GVS]" and that regardless of what was going on with the Union, "he wanted to work for [GVS] and that he wanted to be represented only by [GVS]." One Unit employee who was ultimately terminated by GVS on May 16, 2012 filed a complaint with the Union alleging that it violated its duty of fair representation to him by failing to represent him with regard to his termination from GVS.

Petitioner seeks an injunction restraining GVS from refusing to bargain with the Union as the exclusive collective bargaining representative of a unit of its employees; and in any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act. Petitioner also seeks a mandatory injunction ordering GVS to recognize and, on request, bargain in good faith with the Union concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement; post copies of the Court's Order in this matter at all locations where GVS's notices to employees are customarily posted; maintain such notices free from all obstructions or defacements pending the Board's administrative proceeding; grant to agents of the Board reasonable access to GVS's facility to monitor compliance with this posting requirement; and within 20 days of the issuance of this Order, file with the Court and serve a copy upon the petitioner a sworn affidavit from a responsible official of GVS which describes with specificity how GVS complied with the Court's Order, including the exact locations where GVS posted the

7

materials required. Petitioner requests that the Court grant such injunctive relief until final Board adjudication of the pending charge.

## DISCUSSION

Section 10(j) of the NLRA provides, in relevant part, that "the Board shall have power, upon issuance of a complaint . . . charging that any person has engaged or is engaging in an unfair labor practice, to petition any United States district court . . . for appropriate temporary relief or restraining order." 29 U.S.C. § 160(j). To determine whether to grant an injunction under §10(j), the Second Circuit has set forth a two-pronged test: "First, the court must find reasonable cause to believe that unfair labor practices have been committed. Second, the court must find that the requested relief is just and proper." Hoffman ex rel. N.L.R.B. v. Inn Credible Caterers, Ltd., 247 F.3d 360, 364-65 (2d Cir. 2001).

In determining whether "reasonable cause" exists, a district court is not required to make a final determination as to whether the conduct in question constitutes an unfair labor practice. Silverman v. Major League Baseball Player Relations Comm, Inc. 67 F.3d 1054 (2d Cir. 1995). Courts have held that the Regional Director need only "come forward with evidence 'sufficient to spell out a likelihood of violation.'" See e.g., Blyer v. Pratt Towers, Inc., 124 F. Supp. 2d 136, 143 (E.D.N.Y. 2000) (quoting Danielson v. Joint Bd. of Coat, Suit & Allied Garment Workers' Union, 494 F.2d 1230, 1243 (2d Cir. 1974)).

With respect to issues of fact, the Regional Director should be "given the benefit of the doubt" and all factual inferences should be drawn in his favor if the inference is "within the range of rationality." Hoffman, 247 F.3d at 365 (internal quotation marks omitted). "[O]n questions of law, the Board's view should be sustained unless the court is convinced that it is wrong.'" Id. (quoting Kaynard v. Palby Lingerie, Inc., 625 F.2d 1047, 1051 (2d Cir. 1980). In

8

other words, §10(j) relief should be denied only if the court is "'convinced that the NLRB's legal or factual theories are fatally flawed.'" Mattina v. Ardsley Bus. Corp., 711 F. Supp. 2d 314, 319 (S.D.N.Y. 2010) (quoting Silverman v. J.R.L. Food Corp., 196 F.3d 334, 335 (2d Cir. 1999)).

An injunction is deemed to be "just and proper" when it is "'necessary to prevent irreparable harm or to preserve the status quo.'" Mattina ex rel. N.L.R.B. v. Kingsbridge Heights Rehab. Care Ctr., 329 F. App'x 319, 321 (2d Cir. 2009) (quoting Hoffman, 247 F.3d at 368). Although this standard is meant to "preserve[] traditional equitable principles governing injunctive relief," a court should be mindful to apply this standard "in the context of federal labor laws." Hoffman, 247 F.3d at 368. This means that "irreparable harm" should be interpreted with regard to "the policies of the [National Labor Relations] Act," and actions which undermine these policies can constitute irreparable harm. Id. (quoting Seeler v. Trading Port, Inc., 517 F.2d 33, 40 (2d Cir. 1975)).

In the instant case, the issue of whether there is reasonable cause to believe that an unfair labor practice occurred hinges on a single question of law: Was GVS a Burns successor, and therefore obligated to recognize and bargain with the Union on or about February 18, 2012, when it initially retained seven out of eight of its predecessor's employees pursuant to the Displaced Workers Act? For the reasons set forth below, I hold that petitioner's legal theory is fatally flawed. GVS was not a Burns successor on February 18, 2012. Therefore, there is no reasonable cause to believe that an unfair labor practice has occurred.

The Supreme Court held in NLRB v. Burns Int'l Security Services, Inc., 406 U.S. 272, 92 S. Ct. 1571 (1972), that if a new employer "voluntarily [takes] over a bargaining unit" of its predecessor, then the successor employer is under a duty to bargain with the union that represented the predecessor's employees. Id. at 287, 92 S. Ct. at 1582. In a later case, the Court

9

further explained that determining whether a new company is a successor "is primarily factual in nature and is based upon the totality of the circumstances of a given situation." Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 43, 107 S. Ct. 2225, 2236 (1987). "[T]he focus is on whether there is 'substantial continuity' between the enterprises," and involves assessment of a variety of factors:

> whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers.

Id. Typically, the new employer must "hire a majority of its employees from the predecessor" to be denominated a successor by the NLRB. Id. at 41, 107 S. Ct. at 2235; see also Howard Johnson Co. v. Detroit Local Joint Exec. Bd., 417 U.S. 249, 263, 94 S. Ct. 2236, 2244 (1974) (holding that petitioner was not required to arbitrate with the union because there was "plainly no substantial continuity of identity in the work force.").

The Supreme Court has made it clear that Burns successorship is based on an employer's voluntary choice to hire more than fifty percent of its workforce from its predecessor's workforce. See Fall River, 482 U.S. at 41, 107 S. Ct. at 2235 (explaining that the successorship doctrine is based on the "conscious decision" of the new employer "to maintain generally the same business and to hire a majority of its employees from the predecessor" and that "[t]his makes sense when one considers that the employer intends to take advantage of the trained work force of its predecessor"); Howard Johnson, 417 U.S. 249, 94 S. Ct. 2236 (1974) (finding Howard Johnson was not a Burns successor because it decided to select and hire its own independent work force).

10

Petitioner argues that on February 18, 2012, GVS "hired a substantial and representative complement of employees, a majority of whom were previously employed by its predecessor." Petitioner also argues that GVS thus satisfied the factors identified in <u>Fall River</u> for "substantial continuity": the business of both entities is essentially the same; the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and the new entity has the same production processes, produces the same products, and basically has the same body of customers. Therefore, GVS was a "successor" employer, according to petitioner, and GVS was obligated to recognize and bargain with the Union as of February 18, 2012.[2]

GVS argues that on February 18, 2012, it "initially retained" seven of the eight employees who previously worked at its predecessor's properties, but that it did so only because it had to comply with the Displaced Workers Act for a 90-day "evaluation period." GVS further argues that as soon as it was free to make a choice, at the conclusion of the 90-day period on or about May 16, 2012, it offered permanent employment to four of its predecessor's employees and that it independently hired an additional four employees to complete its staff. Therefore, according to GVS, it never voluntarily hired a majority of its employees from its predecessor and was never under an obligation to recognize and bargain with the Union.

The Court agrees with GVS that the Displaced Workers Act deprived it of the ability to make a voluntary decision to hire its predecessor's employees for a period of 90 days beginning February 18, 2012. Contrary to petitioner's characterization, GVS did not "hire" the workers when it bought out Broadway; they were forced upon it. "Hiring" necessarily includes a

---

[2] The Court recognizes that GVS's predecessor was Broadway, not Vantage. Although Vantage was not GVS's predecessor, the parties appear to concede that for the purposes of determining whether GVS was a successor with a duty to bargain, this fact is irrelevant. When referring to GVS's predecessor's employees, the Court shall therefore mean Vantage's employees, even though Vantage was not the direct predecessor of GVS.

11

voluntary decision by the employer. But the Displaced Workers Act mandates that successor employers "retain" for a period of 90 days its predecessor's employees. By limiting an employer's ability to discharge employees solely to cases of cause or redundancy, the Displaced Workers Act deprives the employer of making the voluntary decision that <u>Burns</u> requires in order to deem an employer to be a successor.

Reading the Supreme Court cases on successorship alongside the language of the Displaced Workers Act, it is clear that a new employer cannot be deemed a <u>Burns</u> successor at the beginning of the 90-day period because it lacks the ability to choose whether to hire its predecessor's employees at that point. On the other hand, a new employer will become a successor at the conclusion of the 90-day transition period, if the employer decides to hire a majority of its employees from its predecessor.[3] The very language of the Act points to this conclusion.[4] It states that for a period of 90 days, the successor employer "shall retain" its predecessor's employees, whereas, at the conclusion of the 90 days, if the employee's performance was satisfactory, "the successor <u>shall offer</u> the employee continued employment." N.Y.C. Admin. Code § 22-505 (emphasis added). The Act itself contemplates that the new employer can only decide whether to hire any of its predecessor's employees at the end of the 90-day period. Moreover, the Displaced Workers Act provides that the offer of continued

---

[3] GVS places great emphasis on the holding of <u>M&M Parkside Towers LLC</u>, 29-CA-27720, 2007 WL 313429 (N.L.R.B. Jan. 30, 2007), in which an ALJ dealt with the successorship issue in the context of the Displaced Workers Act. In <u>M&M</u>, respondent had initially retained all of its predecessor's building maintenance employees pursuant to the Displaced Workers Act, continued to employ those same employees well beyond the 90-day transition period, but refused to recognize and bargain with the union. The critical question in <u>M&M</u> was when did the new employer, having hired a majority of its employees from among its predecessor's employees, regardless of whether by choice or by mandate, have a duty to recognize and bargain with the union? This decision does not directly answer the question at issue in this petition. The Court finds no need to rely on the ALJ's ruling in <u>M&M</u> or even consider the Board's alleged "180 degree change in position," as GVS requests, because the Supreme Court cases discussed in this decision are quite clear on the law that <u>Burns</u> successorship depends on the conscious decision of an employer to hire a majority of its employees from its predecessor's employees.

[4] Although the Displaced Workers Act uses the term "successor employer" to describe new employers, there is no reason to believe that it is referring to a "successor employer" as defined by the Supreme Court in <u>Burns</u> and <u>Fall River.</u>

employment shall be made "under the terms and conditions established by the successor employer or as required by law." Id. This means that after the 90-day period, a new employer is free to establish the terms and conditions of employment, unless otherwise restricted by law, without having to bargain with the union representing the predecessor's employees.[5]

Because it was only until the end of the 90-day transition period, on or about May 16, 2012, that GVS had a choice as to whether to hire its predecessor's employees, based on its evaluation of the employees, and since ultimately, GVS did not hire a majority of its employees from its predecessor, the Court determines that GVS was not a Burns successor. GVS, therefore, had no obligation to recognize or bargain with the Union.

The key to Burns is voluntariness. If the employer is legally precluded as a result of local law from terminating employees except on narrow grounds, then it cannot be held to have made the voluntary decision to become a successor that Burns requires. In essence, petitioner is contending that as a result of the Displaced Workers Act, any and every employer who buys a piece of any New York City business with union employees will be deemed a successor. The fact-based analysis required under Burns and Fall River will always come out in favor of the union because the Displaced Workers Act requires that result. Thus, under petitioner's analysis,

---

[5] If, however, at the end of the 90-day period, a new employer becomes a Burns successor by voluntarily hiring a majority of its employees from its predecessor's workforce, it would be required to recognize and bargain with the union before establishing the terms and conditions of continued employment. The Supreme Court held in Burns:

> Although a successor employer is ordinarily free to set initial terms on which it will hire the employees of a predecessor, there will be instances in which it is perfectly clear that the new employer plans to retain all of the employees in the unit and in which it will be appropriate to have him initially consult with the employees' bargaining representative before he fixes terms. In other situations, however, it may not be clear until the successor employer has hired his full complement of employees that he has a duty to bargain with a union , since it will not be evident until then that the bargaining representative represents a majority of the employees in the unit as required by s 9(a) of the Act, 29 U.S.C. s 159(a).

Burns, 406 U.S. at 294-95. Therefore, once a successor has a duty to bargain, it is obligated to continue in effect the initial terms and conditions it implemented when it retained its predecessor's employees at the beginning of the 90 days, until it has had an opportunity to bargain with the union about any post-successorship changes.

13

the New York City Council has superseded the Supreme Court on a matter of national labor policy, and has deprived employers of the ability to structure the relationship with their employees to avoid being a successor in the manner permitted by Burns.

Petitioner's answer to this is that purchasing employers are on notice of the Displaced Workers Act, and thus when they choose to purchase part of any New York City business with union employees, they have "voluntarily" chosen to be a successor under Burns. However, the choice that Burns was focused on was not the voluntary decision to purchase a business or a piece of one, but the employer's voluntary decision to substantially assume its predecessor's employment force. That is the proper question because we are dealing with an issue of labor relations, not the myriad of other considerations that might drive an employer to enter into a transaction.

Other courts that have considered statutes similar to the Displaced Workers Act have reached the same conclusion, albeit in a somewhat different context. See California Grocers Ass'n v. City of Los Angeles, 52 Cal. 4th 177 (2011), quoting Rhode Island Hospitality Ass'n v. City of Providence, 775 F. Supp. 2d 416 (D.R.I. 2011), aff'd, 667 F.3d 17 (1st Cir. 2011). In Rhode Island, the First Circuit held that the subject local ordinance was not preempted under the NLRA. The basis for the Court's holding was that the successorship doctrine is based on the "conscious decision" of the new employer, and under the ordinance, the new employer would be compelled to continue the employment of the former business's employees, subject to conditions, for three months, whether it wanted to or not. The Court was therefore unable to conclude that the ordinance "would frustrate effective implementation of the Act's processes"

with respect to the successorship determination. Rhode Island, 667 F.3d at 31 (citing Machinists v. Wisconsin Emp't Relations Comm'n, 427 U.S. 132, 148, 96 S. Ct. 2548 (1976)).[6]

GVS could not have made it clearer that it did not intend to hire a majority of its employees from its predecessor's workforce on February 17, 2012. At the beginning of the 90-day transition period, pursuant to the Displaced Workers Act, GVS was not in a position to make such a voluntary decision. At the conclusion of the 90 days, however, GVS was in such a position since it had evaluated the performance of the employees; and based on its evaluation, GVS chose not to hire a majority of its employees from its predecessor's workforce. Moreover, as discussed above, GVS advised its predecessor's employees in writing on February 17, 2012, before the 90-day transition period began, that GVS was not hiring all employees who formerly worked at the properties and that the employees were only being hired pursuant to a 90-day evaluation period.

The fact that the Displaced Workers Act gives new employers the opportunity to terminate its predecessor's employees "for cause" "at any time," including at the beginning of the 90-day transition period, does not mean that the employer was in a position to hire its

---

[6] None of the authorities that petitioner cites are to the contrary. In Springfield Transit Mgmt., Inc., 281 N.L.R.B. No. 17 (Aug. 14, 1986), the Board held that respondent was a Burns successor because even though it was obligated by the Urban Mass Transit Act ("UMTA") to hire its predecessor's employees, respondent had also independently made a decision to hire all of the former employees of its predecessor. In United States Serv. Indus., Inc., JD-215-95, 1995 WL 1918207 (N.L.R.B. Dec. 4, 1995), the ALJ found that respondent was a Burns successor even though it hired its predecessor's employees as it was required under the District of Columbia's Displaced Workers Protection Act ("DCDWPA"). However, the ALJ reached this conclusion based solely on the fact that the Board never formally adopted a requirement that a successor employer must consciously decide to avail itself of its predecessor's trained workforce in order to be considered a Burns' successor employer. The value of this opinion is obviously limited because it did not address the issue on the merits and because the Board has not since adopted the ALJ's position. The other cases petitioner cites are equally unavailing. In Windsor Convalescent Ctr. of North Long Beach, 351 N.L.R.B. No. 44 (Sept. 30, 2007), enf. denied in part on other grounds, 570 F.3d 354 (D.C. Cir. 2009) (citing Sahara Las Vegas Corp., 284 N.L.R.B. No. 34 (June 19, 1987), enf'd 886 F.2d 1320 (9th Cir. 1989)), the Board agreed with the ALJ that the duty to bargain attached when the successor took over operations and hired its predecessor's employees as "temporary" employees subject to review during a 90-day period. However, in both Windsor and Sahara, respondents *chose* to offer temporary employment to some of their predecessor's employees for a period of 90 days. They were not mandated to do so, like GVS was; those respondents voluntarily decided to hire certain employees on a temporary basis.

15

predecessor's employees at the beginning of the 90 days. In other words, the failure of GVS to terminate any of its predecessor's employees for cause at the beginning of the 90-day period, when it was entitled to, cannot be interpreted as the equivalent of GVS voluntarily hiring a majority of its employees from its predecessor's employees. A new employer would not have much "cause" to fire employees at the beginning of the 90-day period anyway, since it would presumably not know enough about the skills and capabilities of the employees. This may be the reason why GVS did not fire any of Vantage's employees for cause at the beginning of or during the 90-day transition period. Nonetheless, the fact that it did not fire any of the employees for cause does not mean that GVS demonstrated an intent to actively hire any of them.

The Second Circuit has recognized that the grant of an injunction pursuant to section § 10(j) of the Act is an extraordinary remedy. McLeod v. General Electric Company, 366 F.2d 847 (2d Cir. 1966). Injunctive relief under § 10(j) is just and proper when it is necessary to prevent irreparable harm and to preserve the status quo." Hoffman v. Inn Credible Caterers, Ltd., 247 F.3d 360, 368 (2d Cir. 2001); see also Kaynard v. Mego Corp., 633 F.2d 1026, 1033 (2d Cir. 1980) (holding that injunctive relief is just and proper when there is a "compelling necessity" to preserve the status quo or prevent irreparable harm, such as in the case of flagrant or continuing violations of the Act). The test for whether harm is irreparable in the context of § 10(j) successorship cases is whether the employees' collective bargaining rights may be undermined by the successor's unfair labor practices and whether any further delay may impair or undermine such bargaining in the future." Hoffman, 247 F.3d at 369.

Since the Court has not found reasonable cause to believe that an unfair labor practice occurred, it follows that granting the injunctive relief requested by petitioner would not be just and proper.

## CONCLUSION

The petition for injunctive relief under § 10(j) of the NLRA is denied and the case is dismissed.

**SO ORDERED.**

                                                                             s/Brian M Cogan

                                                                            U.S.D.J.

Dated: Brooklyn, New York
       November 13, 2012